IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MAX MOUSSAZADEH, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. G-07-574 |
| | § | |
| TEXAS DEPARTMENT OF CRIMINAL | § | |
| JUSTICE, *et al.*, | § | |
| Defendants. | § | |

<u>OPINION ON REMAND</u>

Although Jewish inmate Max Moussazadeh originally challenged the Texas prison policy of not providing kosher food to Jewish inmates when he filed suit in 2005, the central issue in this case on remand involves the application of the Texas Department of Criminal Justice-Correctional Institutions Division's ("TDCJ-CID") Chaplaincy Manual Policy Number 07.03 (rev.2) ("the Policy"), dated April 2007, and signed by Bill Pierce, Director of Chaplaincy Operations. (Docket Entry No.198-3, pages 12-15). The policy subject at issue, "Judaism: Reassignment Procedures to a Jewish-Designated Unit," provides for two types of designated Jewish units in TDCJ-CID -- an Enhanced Designated Jewish Unit and a Basic Designated Jewish Unit. (*Id.*, page 12). Jewish inmates incarcerated on the Enhanced Designated Jewish Unit, *i.e.*, the Stringfellow Unit, are provided kosher meals from an on-site kosher kitchen. (*Id.*). Jewish inmates incarcerated on a Basic Designated Jewish Unit, such as the Stiles Unit, may purchase kosher entrees and other kosher products through the unit commissary. (*Id.*, pages 12-13).

In its Opinion on Dismissal of March 26, 2009, this Court rejected Moussazadeh's claim that he was not receiving kosher meals on the Stringfellow Unit in violation of the

Religious Land Use and Institutionalized Persons Act ("RLUIPA") and denied his motion for summary judgment on this ground. (Docket Entry No.135). The Court found that because Moussazadeh had been transferred off the Eastham Unit, where he had been denied a kosher diet, and transferred to the Stringfellow Unit, where he was provided with a kosher diet, his requests for injunctive and declaratory relief were moot. (*Id.*). In March 2009, this Court granted the TDCJ-CID defendants' motion and dismissed Moussazadeh's complaint as moot. (Docket Entry No.135). Moussazadeh filed an appeal from this judgment.

On January 6, 2010, TDCJ-CID confirmed that Moussazadeh had been transferred for disciplinary reasons to the Stiles Unit on October 13, 2009.[1] *Moussazadeh v. Texas Department of Criminal Justice*, No.09-40400, Document 0051997970. On February 5, 2010, the Fifth Circuit Court of Appeals remanded the case to this Court. *Moussazadeh v. Texas Department of Criminal Justice*, No.09-40400 (5th Cir. 2010) (unpublished).

The action of this court upon remand of a case by the Fifth Circuit is governed by the "mandate rule," which is an application of the law of the case doctrine. *Litman v. Massachusetts Mut. Life Ins. Co*., 825 F.2d 1506, 1511 (11th Cir. 1987); *see also Vieux Carre Property Owners, Residents and Associates, Inc. v. Brown*, 948 F.2d 1436, 1443 (5th Cir. 1991).

---

[1] Moussazadeh committed significant major disciplinary violations while incarcerated on the Stringfellow Unit, which resulted in action by the State Classification Committee to change his custodial classification to G-5, or close custody. (Docket Entries No.198, pages 3-4; No.198-5, pages 2-13). Because the Stringfellow Unit houses inmates with custodial classifications of G-1 or trusty status, to G-4 or medium custody, Moussazadeh's change in custodial classification required the State Classification Committee to transfer him on October 13, 2009, to the Stiles Unit, which houses G-5 inmates. (Docket Entry No.198-5, page 3). In November 2010, the Stiles Unit Classification Committee promoted Moussazadeh to a custodial level of G-2 in accordance with the review required by the TDCJ Classification Policy. (Docket Entry No.198-8, page 3). At that time, Moussazadeh became eligible for a transfer back to the Stringfellow Unit to participate in the Enhanced Jewish program, which includes receiving kosher meals. (Docket Entry No.198, page 5-6). TDCJ-CID defendants maintain, without supporting documentation, that Moussazadeh was not transferred back to the Stringfellow Unit because he asserted that his life was in danger while at the Stringfellow Unit and thus, a life endangerment investigation was implemented per TDCJ policy. (Docket Entry No.221, n.3). The life endangerment claims were not substantiated. (*Id*.). TDCJ-CID defendants note that on March 18, 2011, Moussazadeh was found in possession of contraband, and was again reclassified as G-5. (*Id.*).

2

The mandate rule requires the following of a district court, as explained by the Court of Appeals

for the Third Circuit, in pertinent part:

> [O]n remand for further proceedings after decision by an appellate court, the trial court must proceed in accordance with the mandate and the law of the case as established on appeal. A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces. . . . The rule ensures "careful observation of [the] allocation of authority" established by the three-tier system of federal courts which "is necessary for a properly functioning judiciary."

*Casey v. Planned Parenthood of Southeastern Pa.*, 14 F.3d 848, 857 (3d Cir. 1994) (citations

omitted).

> In this case, the Fifth Circuit issued the following mandate:

> The district court dismissed this case as moot. Since that time the conditions and treatment about which this prisoner complained have substantially changed, and these changes affect the issues before us. Moreover, before we can address the merits of this appeal, there are matters to be brought before the district court that must be addressed by it. We therefore remand for additional proceedings to allow the parties and the district court to further develop the record. . . . In any event, once the district court has ruled, the parties should advise the clerk of this court whether this appeal has or has not been mooted by the district court's actions.

(Docket Entry No.145).

A claim is moot when the parties are no longer "adverse parties with sufficient

legal interests to maintain the litigation." *DeMoss v. Crain*, 636 F.3d 145, 150 (5th Cir. 2011)

(quoting *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 324 (5th Cir. 2009), quoting

*United States v. Lares–Meraz*, 452 F.3d 352, 354 (5th Cir. 2006) (per curiam), *aff'd* __U.S.__,

131 S.Ct. 1651 (2011)). "'[A] defendant's voluntary cessation of a challenged practice does not

deprive a federal court of its power to determine the legality of the practice. . . A case might

become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior

could not reasonably be expected to recur.'" *Sossamon*, 560 F.3d at 325 (quoting *Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.* (528 U.S. 167, 189 (2000)).  Embracing the principles of the mandate rule and taking into consideration that Moussazadeh's transfer to the Stiles Unit during the pendency of the appeal have made it less than clear that the challenged conduct might reasonably be expected to recur, the Court presumes that Moussazadeh's request for injunctive relief, ordering defendants TDCJ-CID, Brad Livingston, and David Sweeten ("TDCJ-CID defendants"), to provide him with a nutritionally sufficient kosher diet per RLUIPA, presents a live case and controversy and therefore, is no longer moot.  The Court makes no other presumptions or amendments with respect to all other issues addressed in its Opinion on Dismissal, except as noted herein.

To develop the record per the appellate court's mandate and address the present claim, the Court ordered the parties to conduct discovery on three specific issues and to submit supplemental dispositive motions.  (Docket Entry No.152).  *See U.S. v. Bell Petroleum Servs., Inc.*, 64 F.3d 202, 204 (5th Cir. 1995) (noting "[w]here further proceedings are contemplated by an appellate opinion, the district court retains the discretion to admit additional evidence").  The three issues designated by the Court are, as follows:

1.  Whether the failure to provide Moussazadeh with kosher meals at the Stiles Unit poses a substantial burden on his religious practices under *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007);

2.  Whether TDCJ's decision not to provide kosher meals at prison units other than the Stringfellow Unit is the least restrictive means of furthering a compelling government interest; and,

3.  Whether Moussazadeh is entitled to a guarantee that he will receive kosher meals for the duration of his seventy-five year prison sentence.

(Docket Entry No.152).  Pending are Moussazadeh's and TDCJ-CID defendants' supplemental cross-motions for summary judgment (Docket Entries No.198, No.199) and their responses to the same.  (Docket Entries No.200, No.201, No.202, No.204, No.205).  The Department of Justice has also filed a Statement of Interest (Docket Entry No.211), to which TDCJ-CID defendants have filed a Response in Opposition.  (Docket Entry No.221).

For the reasons to follow, the Court REAFFIRMS its finding that Moussazadeh's requests for injunctive and declaratory relief are moot and AMENDS the Opinion on Dismissal of March 26, 2009, by granting the TDCJ-CID defendant's supplemental motion for summary judgment and denying Moussazadeh's supplemental motion for summary judgment.

## I. EVIDENTIARY ISSUES

Both parties raise objections to the summary judgment evidence.  Moussazadeh moves to strike three documents, *i.e.,* an errata sheet and two affidavits, which the TDCJ-CID defendants proffered as summary judgment evidence.  (Docket Entry No.203).  TDCJ-CID defendants move to strike two expert affidavits attached to Moussazadeh's response to defendant's motion for summary judgment.  (Docket Entry No.206).

### A. Moussazadeh's Motion to Strike

Moussazadeh indicates that he sought discovery of TDCJ-CID commissary policies with respect to the spending limits imposed on inmates.  (Docket Entry No.203, pages 1-2).  TDCJ-CID defendants produced the latest version of the Chaplaincy Manual, which provides that inmates may purchase kosher entrees and products through the unit commissary, and the Commissary Manual, which sets monetary limits on an inmate's ability to purchase most items, including food, at the unit commissaries.  (*Id.*).  Moussazadeh asserts that according to TDCJ policy, inmate spending limits are based upon the inmate's security classification and neither

5

manual explicitly exempts kosher entrees or other religious dietary purchases from the spending limits.  (*Id*., page 2).

TDCJ-CID defendants' designated witness, Allison Dunbar of TDCJ's Office and Budget, attested by deposition to questions regarding the commissary policy as found in the November 2004 Offender Orientation Handbook.  (Docket Entries No.198-50, page 24; No.207-1, pages 6-7).   Moussazadeh claims that Dunbar's testimony "conclusively established that kosher meals are not, at least under TDCJ's current policy, exempted from commissary spending limits."  (Docket Entry No.203, page 3).   Moussazadeh complains that two days before dispositive motions were due, TDCJ-CID defendants "produced an errata sheet to the Dunbar deposition attempting to reverse all of her substantive answers on the commissary spending limits."  (*Id.*).  He also complains about the timeliness of the errata sheet.  (*Id*., pages 5-7).

Federal Rule of Civil Procedure 30(e)(1) allows a deponent to make changes in "form or substance" to the deposition.  Rule 30(e) (1) states, the following in pertinent part:

> On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
>
> (A) to review the transcript or recording; and
>
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED. R. CIV. P. 30(e)(1).  The Fifth Circuit has not addressed the scope of permissible substantive corrections to a deposition under Rule 30(e) and courts have taken a variety of approaches.  The traditional view is that Rule 30(e) permits a deponent to change deposition testimony by timely corrections, even if they contradict the original answers, giving reasons.  *See, e.g., Eicken v. USAA Fed. Savings Bank*, 498 F.Supp.2d 954, 961-62 (S.D. Tex. 2007).  Other courts apply the analysis used in the "sham-affidavit" rule to Rule 30(e) corrections.  This approach allows such

corrections if the deponent can provide a reason showing that the changes were not simply "purposeful rewrites tailored to manufacture an issue of material fact*." Hambleton Bros. Lumber Co. v. Balkin Enterprises*, 397 F.3d 1217, 1225 (9th Cir. 2005). This Court has rejected a strict approach to changes under rule 30(e) in favor of a more flexible approach. "The Rule allows changes in substance for legitimate reasons, such as to correct a misstatement or an honest mistake. The more flexible approach allows for legitimate corrective changes while implementing adequate safeguards to prevent abuse." *See Devon Energy Corp. v. Westacott*, Civil Action No.H-09-1689, 2011 WL 1157334 at *6 (S.D. Tex. Mar. 24, 2011).

Dunlap's errata sheet reflects a correction to her testimony regarding her understanding of the inmate's spending limit with respect to kosher food as stated in the Offender Orientation Handbook, and not the Chaplaincy Manual or the Commissary Handbook. Her corrected testimony affirmatively states that an inmate may purchase a kosher meal any day and that the purchase of both kosher Passover and kosher non-Passover meals do not apply towards the offender's commissary spending limit. (Docket Entry No.203-1, page 37). Dunbar indicates that the corrections were necessary due to her misunderstanding of the kosher, non-Passover meals counting towards the offender's commissary spending limit. (*Id*.).

Contrary to Moussazadeh's claim, the record does not show that Dunbar conclusively or unambiguously confirmed the policy of counting kosher purchases toward the inmate's commissary spending limit in her original deposition testimony. (Docket Entry No.203, page 2). Instead, her original deposition testimony reflects that she stipulated to her uncertainty about the offender's commissary spending limits with respect to kosher, non-Passover meals.[2]

---

[2] The transcript of Dunlap's original deposition testimony regarding spending limits is, as follows, in pertinent part:

Q.  Okay.  So if an offender has a $25 limit for every two weeks, like a G5 offender, and spent $4.50 on a meal, and it is not Passover, then he could afford roughly five-and-a half-meals over that two-week period.  Is that correct?

A.  Yes, unless I misunderstood but –

Q.  $4.50 goes into 25 roughly five-and-a half times or three times?

A.  Uh-huh.

Q.  And once he purchased that, let's say the fifth meal or sixth meal or wherever we are, he would not be allowed to purchase any further meals until that two-week period is up.  Is that correct?

                              *     *     *     *     *

Q.  Sure.  This is a two-week limit.  Right?

A.  Yes.

Q.  So once the offender has used up that $25 limit for the two weeks, he has to stop spending at the commissary, and he can't start-up again until the next two-week period begins.  Is that correct?

A.  For non Passover –

Q.  Yes.

A.  --kosher meals?

Q.  Yes, ma'am.

A.  I believe that is correct.

Q.  Okay.  Has TDCJ ever considered making an exception for the purchase of meals, basically say that the purchase of any meals, not just on Passover but any kosher meal will not count against the spend period balance?

A.  Not that I'm aware of, no sir.

Q.  So TDCJ has never considered extending that Passover exception that we were talking about to include all kosher meal purchases at the commissaries.  Is that right?

A.        Correct.

Q.        Okay.

A.        I would like to stipulate I may be mistaken on that.

Q.        Okay.

A.        That may be for kosher and Passover meals.

Q.        Okay.

(Docket Entry No.207-1, pages 6-7).  Although Dunlap's correction to her deposition is a change in substance, it does not squarely contradict her previous answers.  Dunlap's change is permissible because she has stated a reason and given supporting details.  Dunlap's original deposition testimony, however, will remain as part of the record.

Moussazadeh also complains of two affidavits submitted by Suzanne Vaughn, the Program Supervisor for the Commissary and Trust Fund Department.  (Docket Entry No.203, page 1).  TDCJ-CID defendants contend that Vaughn was not disclosed as a Rule 30(b)(6) witness and her affidavits directly contradict Dunlap's sworn testimony and TDCJ's official documents and therefore, are sham affidavits.  (*Id*., page 1).

A party may not create a genuine issue of material fact with an affidavit that contradicts prior deposition testimony.  *Thurman v. Sears, Roebuck & Co.,* 952 F.2d 128, 136-37 n. 23 (5th Cir. 1992).  When an affidavit is impeached by prior sworn testimony without sufficient explanation, the court must view that affidavit with profound skepticism.  *See Herrera v. CTS Corp.*, 183 F.Supp.2d 921, 928 (S.D.Tex. 2002) (citation omitted).  Indeed, it is within the court's discretion to disregard an affidavit altogether should the court determine that it is dealing with a "sham affidavit."  *See Doe v. Dallas Indep. Sch. Dist.*, 220 F.3d 380, 386 (5th Cir. 2000) (noting that the utility of summary judgment would be greatly diminished were courts unable to screen out "sham issues of fact").  Nevertheless, when an affidavit merely supplements or clarifies rather than contradicts prior sworn testimony, a court may consider that affidavit

---

A.      The exemption of going towards that limit.

Q.      Okay.  But to the best of your knowledge –

A.      To the best of my knowledge, it is only Passover.

(Docket Entry No.207-1, pages 6-7).

when evaluating genuine issues in a motion for summary judgment.  *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 496 (5th Cir. 1996).

In an affidavit dated November 8, 2010, Vaughn testified "that kosher entrees are coded as to not affect an offenders spend period balance."  (Docket Entry No.203-1, page 39).  In an affidavit dated November 24, 2010, Vaughn certified that "kosher food items are sold at all TDCJ commissaries, and such items are available year round to the offender population at all units"; she further attested that "[p]urchase of the Kosher entrees listed in the price list, under the header of Kosher Items, . . . and Passover Kosher pre-packaged meals and food items are not counted against the offender's commissary spending limit."  (*Id.*, page 41).  Vaughn's affidavits do not contradict the Chaplaincy or Commissary Manuals.  The affidavits also appear to substantiate Dunlap's errata sheet and therefore, are not subject to being stricken as sham affidavits.  (Docket Entry No.203-1, pages 39, 41).

Moussazadeh further complains that Dunlap's errata sheet should be stricken as untimely filed because TDCJ-CID defendants failed to submit any errata to the court reporter within the time agreed to by the parties. (Docket Entry No.203, page 6).  The record reflects that Dunbar was deposed on September 29, 2010.  (Docket Entry No.203-1, pages 26, 30).  The parties agreed at that time that she had 45 days "per agreement of counsel after being notified by the officer that the transcript is available for review by the witness and if there are any changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them."  (*Id.*, page 33).  On October 13, 2010, the parties were notified that Dunlap's deposition testimony was ready for review.  (Docket Entry No.203-1, page 45).  On November 19, 2010, Dunlap's errata sheet was signed and notarized.  (Docket Entry No.203-1, page 36).  On November 30, 2010, defendants mailed the

original errata sheet to the court reporter, confirming the documents they sent to the reporter on

November 29, 2010, via email.  (*Id.*, page 35).  Defendants argue that their failure to mail the

errata sheet to insure its arrival on time, rather than three days late, is excusable neglect because

the deadline to review the deposition expired on Saturday, November 27, 2010, during the

Thanksgiving holiday weekend.    (Docket Entry No.207, page 3).    The Court agrees.

Moussazadeh's Opposed Motion to Strike (Docket Entry No.203) is DENIED.

### B. TDCJ-CID Defendants' Motion to Strike

TDCJ-CID defendants move to strike Moussazadeh's Exhibits 35 and 36, *i.e.*, the

affidavit testimony of experts Rabbi Moshe Heinemann and George Sullivan, attached to

Moussazadeh's Response to TDCJ-CID defendants' supplemental Motion for Summary

Judgment.  (Docket Entry No.206, pages 1-2).  TDCJ-CID defendants contend that both

witnesses clearly identified themselves as testifying experts and offered their opinions in their

respective declarations but Moussazadeh failed to identify either affiant as an expert in its

Disclosures to TDCJ-CID defendants as required by Rule 26(a)(2)(A) of the Federal Rules of

Civil Procedure.

Moussazadeh argues that Rule 26(a)(2)(A) does not require the parties to disclose

expert witnesses before the start of summary judgment briefing.  (Docket Entry No.208, page 3).

Rule 26 of the Federal Rules of Civil Procedure mandates that a party "disclose to the other

parties the identity of any witness it may use at trial to present" expert testimony.  FED. R. CIV. P.

26(a)(2)(A).  Rule 26(a)(2)(C) provides that the deadline to disclose expert testimony, absent a

stipulation or court order, is "at least 90 days before the date set for trial."  In this case, the Court

did not stipulate or order when the parties were to disclose the identity or testimony of expert

witnesses.  (Docket Entry No.185).  The Court did not set a trial date because the Fifth Circuit did not vacate the judgment of this Court but remanded the case for further findings.

This Court, however, upon a joint motion by the parties, ordered that "[d]iscovery shall be completed by October 15, 2010."  (Docket Entry No.185).  On November 8, 2010, the Court granted another Joint Motion to Extend Dispositive Motions Deadlines.  (Docket Entry No.194).  In such Order, the Court emphatically noted that "[t]he case is now more than five years old; discovery has ceased.  Therefore, the deadlines sought and entered are firm."  (*Id.*).  The parties each filed a motion for summary judgment on December 10, 2010.  (Docket Entries No.199, No.200).

Notwithstanding the firm deadline and the cessation of discovery, Moussazadeh indicates that he sought out the declarations from these two experts because the TDCJ-CID defendants allegedly raised "a slew of new arguments and *factual* assertions" in its Second Motion for Summary Judgment.  (Docket Entry No.208, pages 1-2) (emphasis added).  Moussazadeh did not file a motion to reopen discovery but engaged in discovery in violation of the Court's unambiguous order.[3]

"Control of discovery is committed to the sound discretion of the trial court and its discovery rulings will be reversed only where they are arbitrary or clearly unreasonable."  *Mayo v. Tri-Bell Industries, Inc.*, 787 F.2d 1007, 1012 (5th Cir. 1986).  "Generally, a ruling that denies a party an adequate opportunity to discover facts to oppose a motion for summary judgment is unreasonable if summary judgment is subsequently entered against that party."  *Williamson v. U.S. Dept. of Agriculture*, 815 F.2d 368, 382 (5th Cir. 1987).  However, Rule

---

[3] Defendants filed their motion for summary judgment on December 10, 2010.  (Docket Entry No.198).  Rabbi Moshe Heinemann executed his affidavit on January 7, 2011.  (Docket Entry No.201-2, page 19).  George Sullivan executed his affidavit on January 17, 2011.  (*Id.*, page 32).

37(b)(2) of the Federal Rules of Civil Procedure grants the district court discretion to exclude evidence due to a party's noncompliance with a discovery order. *See Barrett v. Atlantic Richfield Co.,* 95 F.3d 375, 380 (5th Cir. 1996). The Fifth Circuit has enunciated a four-part test for the consideration of exclusion of evidence pursuant to Rule 37(b)(2): "(1) the explanation, if any, for the party's failure to comply with the discovery order; (2) the prejudice to the opposing party of allowing the [evidence]; (3) the possibility of curing such prejudice by granting a continuance; and (4) the importance of [the evidence]." *See id.*

Moussazadeh proffers no explanation for his failure to move to reopen discovery. TDCJ-CID defendants most certainly are prejudiced by the evidence proffered by the experts. Moussazadeh acknowledges that it attached such expert opinion affidavit testimony to rebut TDCJ-CID defendants' contention that costs and security were compelling government interests under RLUIPA for denying Moussazadeh a kosher meal.[4] (Docket Entry No.201, pages 23-25, 27). This case has been pending for more than five years and a continuance at this stage of proceedings would only result in additional delay and unnecessary expense.

Accordingly, TDCJ-CID defendants' Motion to Strike (Docket Entry No.206) is GRANTED. The Court ORDERS that Moussazadeh's Exhibits 35 and 36 attached to Moussazadeh's Opposition to TDCJ-CID defendants' Second Motion for Summary Judgment (Docket Entry No.201-2, pages 12-32) be STRICKEN from the record.

## II. SUMMARY JUDGMENT

---

[4] Moussazadeh offers the affidavit testimony of Rabbi Heinemann to rebut defendants' challenge to the sincerity of Moussazadeh's belief, including Moussazadeh's purchase of non-kosher commissary items during his incarceration on the Stiles Unit, and defendants' contention regarding the use of a microwave oven to heat kosher meals. (Docket Entries No.201, pages 23-25, 40-41, 48-49; No.201-2, pages 12-19). Moussazadeh proffers the affidavit testimony of George Sullivan, an expert in the management and operations of correctional facilities, to rebut defendants' "original claim of a compelling security interest in denying a kosher diet." (Docket Entries No.201, page 27; No.201-2, pages 21-32).

The parties have filed cross-motions for summary judgment, responses to summary judgment motions, and replies in support of summary judgment motions. (Docket Entries No.198, No.199, No.200, No.201, No.204, No.205). In addition, the United States Department of Justice has submitted a Statement of Interest of the United States (Docket Entry No.211), to which TDCJ-CID defendants have filed a Response in Opposition. (Docket Entry No.221).

A party moving for summary judgment must inform the court of the basis for the motion and identify those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, that show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The substantive law governing the suit identifies the essential elements of the claims at issue and therefore indicates which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden falls on the movant to identify areas essential to the nonmovant's claim in which there is an "absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the moving party fails to meet its initial burden, the motion must be denied, regardless of the adequacy of any response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Moreover, if the party moving for summary judgment bears the burden of proof on an issue, either as a plaintiff or as a defendant asserting an affirmative defense, then that party must establish that no dispute of material fact exists regarding all of the essential elements of the claim or defense to warrant judgment in his favor. *Fontenot v. Upjohn*, 780 F.2d 1190, 1194 (5th Cir. 1986) (the movant with the burden of proof "must establish beyond peradventure *all* of the

essential elements of the claim or defense to warrant judgment in his favor") (emphasis in original).

Once the movant meets its burden, the nonmovant must direct the court's attention to evidence in the record sufficient to establish that there is a genuine issue of material fact for trial. *Celotex*, 477 U.S. at 323-24. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Instead, the nonmoving party must produce evidence upon which a jury could reasonably base a verdict in its favor. *Anderson*, 477 U.S. at 248. To do so, the nonmovant must "go beyond the pleadings and by [its] own affidavits or by depositions, answers to interrogatories and admissions on file, designate specific facts that show there is a genuine issue for trial." *Webb v. Cardiothoracic Surgery Assoc. of North Texas, P.A*., 139 F.3d 532, 536 (5th Cir. 1998). Unsubstantiated and subjective beliefs and conclusory allegations and opinions of fact are not competent summary judgment evidence. *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). Nor are pleadings summary judgment evidence. *Wallace v. Tex. Tech Univ*., 80 F.3d 1042, 1046 (5th Cir. 1996). The nonmovant cannot discharge his burden by offering vague allegations and legal conclusions. *Salas v. Carpenter*, 980 F.2d 299, 305 (5th Cir. 1992). Nor is the court required by Rule 56 to sift through the record in search of evidence to support a party's opposition to summary judgment. *Ragas v. Tennessee Gas Pipeline Co*., 136 F.3d 455, 458 (5th Cir. 1998).

Nevertheless, all reasonable inferences must be drawn in favor of the nonmoving party. *Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co*., 336 F.3d 410, 412 (5th Cir. 2003). Furthermore, the party opposing a motion for summary judgment does not need to present additional evidence, but may identify genuine issues of fact existing in the summary

judgment evidence produced by the moving party.  *Isquith v. Middle South Utilities, Inc.,* 847 F.2d 186, 198-200 (5th Cir. 1988).   The nonmoving party may also identify evidentiary documents already in the record that establish specific facts showing the existence of a genuine issue.  *Lavespere v. Niagara Mach. & Tool Works, Inc*., 910 F.2d 167, 178 (5th Cir. 1990).

A. Procedural Objections

1. Failure to File Amended Complaint

TDCJ-CID defendants move for summary judgment because Moussazadeh has not filed an amended complaint asserting claims that reflect his present circumstances, which differ greatly from the circumstances to which he was subjected when he filed his original complaint in 2005.  (Docket Entry No.198, pages 16-17).   Moussazadeh contends he is not required to file an amended complaint because the issue raised in his original complaint, *i.e.,* the denial of kosher food, has not changed.  (Docket Entry No.201, pages 55-56).

The record shows that after the case was transferred to this Court, Moussazadeh moved to amend his pleading with a claim that TDCJ had refused to guarantee that he would receive kosher meals if he was transferred off the Stringfellow Unit.  (Docket Entry No.117). The Court found that Moussazadeh's request for a permanent injunction in his original complaint, requiring TDCJ-CID defendants to provide him with a nutritionally sufficient kosher diet, sufficiently incorporated this claim and denied Moussazadeh's Opposed Motion for Leave to File an Amended and Supplemental Complaint.  (Docket Entry No.135, page 11).  With that in mind, the Court framed the issues on remand and allowed discovery on the same.  (Docket Entry No.152).  Although his present circumstances differ greatly from those in 2005, the procedural posture of this case does not require that Moussazadeh amend his complaint.

16

## 2. Exhaustion of Administrative Remedies

TDCJ-CID defendants also move for summary judgment because Moussazadeh has failed to exhaust his administrative remedies regarding kosher meals.  (Docket Entry No.198, pages 13-15).  The uncontroverted record shows that Moussazadeh has not filed any grievances while at the Stiles Unit complaining that the Stiles Unit kitchen has not served him with kosher food, that the menu options of regular, pork-free, or meat-free meals do not meet his religious practices, or that the kosher items for purchase through the unit commissary are inadequate or prevent him from practicing his religious beliefs.  (Docket Entries No.198-11; No.198-12).  In fact, Moussazadeh has not submitted any grievances regarding religious services or kosher meals while incarcerated at the Stiles Unit.  (Docket Entry No.198-14).

Moussazadeh contends that he is not required to file additional grievances with respect to the denial of kosher food because he exhausted his administrative remedies in July 2005, while on the Eastham Unit, when his grievances regarding kosher meals were denied. (Docket Entry No.201, pages 52-53).   In his original complaint of October 12, 2005, Moussazadeh stated that he complained of the denial of kosher meals in his Step 1 Grievance, as follows:

> I am a jewish inmate.  My beliefs state that I must eat kosher foods.  I am born and raised jewish and both of my parents are jewish.  Since I have been in the prison system, I have been forced to eat non kosher foods.  All of my life my family has kept a kosher house hold.  I feel that I am going against my beliefs and that I will be punished by God for not practicing my religion correctly. * * *  In my requests I asked that I be allowed to receive kosher meals because it is part of my religious duty.  * * *  I am asking that you please grant me access to kosher meals in the prison dining hall.

(Docket Entry No.1, page 5).

TDCJ-CID defendants claim that Moussazadeh's 2005 grievance regarding the lack of kosher food at the Eastham Unit does not exhaust his administrative remedies as to any complaint he has regarding the Stiles Unit and does not address an on-going violation because Moussazadeh was receiving a kosher diet supplied by a kosher kitchen on the Stringfellow Unit from May 27, 2007, to October 13, 2009.  (Docket Entry No.198, page 14).

Title 42, United States Code, 1997e(a), as amended by Section 803 of the Prison Litigation Reform Act of 1995, provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Section 1997(e) does not say how specific a prisoner's grievances must be, but that as a general rule, courts typically use a standard according to which a grievance must give prison officials "fair notice" of the problem that will form the basis of the prisoner's suit.  *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004).  In determining how much detail is required, a court must interpret the exhaustion requirement in light of its purposes, including the goal of giving officials time and opportunity to address complaints internally.  *Id.* at 516 (citing *Porter v. Nussle*, 534 U.S. 516, 525 (2002)).

An inmate who is subjected to repeated or continued abuse need not continue to file grievances about the same issue.  *Id*. at 521 (citing *Aiello v. Litscher*, 104 F.Supp.2d 1068, 1074 (W.D. Wis. June 7, 2000) (holding that when inmates have filed a grievance regarding a prison policy, they need not file grievances regarding subsequent incidents in which the policy is applied)).  Moreover, TDCJ policies direct prisoners not to file repetitive grievances about the same issue and threaten sanctions for excessive use of the grievance process.  (*Id.*).

A grievance filed in response to one particular incident does not automatically exhaust claims that arise from future incidents of the same general type.  *Id.* at 521, n.13.  To

exhaust administrative remedies, an inmate must file additional grievances for future incidents that reflect a different problem. *Id.*

At the time Moussazadeh filed his original complaint, TDCJ provided Jewish inmates a choice between pork-fee, meat-free, and regular diet trays. (Docket Entry No.1, page 4). In April 2007, TDCJ-CID's policy changed. Chaplaincy Manual Policy Number 07.03, established the Jewish Designated Units, which provide inmates with an opportunity to receive kosher meals. (Docket Entry No.198-3, pages 12-15). In May 2007, Moussazadeh was transferred to the Stringfellow Unit, where he was provided with kosher meals from an on-site kosher kitchen. (Docket Entry No.75). Thereafter, he was transferred for disciplinary reasons to the Stiles Unit, where prepackaged kosher food is available for purchase.

After Moussazadeh was transferred off the Eastham Unit, he was subjected to a different dietary policy and to circumstances that differed greatly from the policy and circumstances, to which he was subjected on the Eastham Unit. While the core issue with respect to his request for a permanent injunction remains, the circumstances that he has faced on the Stringfellow and the Stiles Units give rise to a different set of problems than those he faced on the Eastham Unit. Without filing a grievance complaining about the availability of kosher food on the Stiles Unit, Moussazadeh did not give TDCJ officials fair notice and the opportunity to address his complaint about this particular accommodation. *See Cutter v. Wilkinson*, 544 U.S. 709, 723 n. 12 (2005) (citing 42 U.S.C. § 1997e(a) and 42 U.S.C. § 2000cc-2(e) and noting that "[s]tate prison officials make the first judgment about whether to provide a particular accommodation, for a prisoner may not sue under RLUIPA without first exhausting all available administrative remedies").

Because the uncontroverted record reflects that Moussazadeh has not exhausted his administrative remedies regarding the revised Chaplaincy Policy and the circumstances with respect to the availability of kosher food on the Stiles Unit, Moussazadeh's claims regarding the same are subject to dismissal pursuant to 42 U.S.C. § 1997(e).

### B. Application of RLUIPA

Alternatively, Moussazadeh's request for injunctive relief is subject to dismissal because Moussazadeh has not meet his burden to show that TDCJ's policy with respect to kosher meals at the Stiles Unit poses a substantial burden on his religious practices under *Baranowski v. Hart*, 486 F.3d 112 (5th Cir. 2007).[5]

RLUIPA "protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion." *Cutter*, 544 U.S. at 721. RLUIPA does not elevate accommodation of religious observances over an institution's need to maintain order and safety; nor does it override other significant interests. *Id.* "Should inmate requests for religious accommodations become excessive, impose unjustified burdens on other institutionalized persons, or jeopardize the effective functioning of an institution, the facility [is] free to resist imposition." *Id.* at 726.

RLUIPA provides, the following, in pertinent part:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—

(1) is in furtherance of a compelling governmental interest; and

---

[5] The Court's first designated issue and the threshold issue in this case is "[w]hether the failure to provide Moussazadeh with kosher meals at the Stiles Unit poses a substantial burden on his religious practices." (Docket Entry No.152).

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc–1(a).

Under RLUIPA, Moussazadeh bears the initial burden of proving that "the challenged government action 'substantially burdens' the plaintiff's 'religious exercise.'" *Mayfield v. Tex. Dept. of Criminal Justice*, 529 F.3d 599, 613 (5th Cir. 2008). The RLUIPA framework requires that a court ask two initial questions: (1) is the burdened activity religious exercise; and (2) is that burden substantial. *Id.* at 613.

"Religious exercise" is defined broadly as: "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Under the RLUIPA, a plaintiff must show that the practices the plaintiff requests permission to engage in are religious exercise, *i.e,* whether "the religious practice [s] at issue [are] important to the free exercise of his religion." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004) (stating that RLUIPA complainant bears burden of proving religious practice is important to free exercise of his religion). This determination requires consideration of the importance of the practice to the plaintiff himself. *See Cutter*, 544 U.S. at 725, n. 13 (stating that "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion [but] does not preclude inquiry into the sincerity of a prisoner's professed religiosity"); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009) (stating "[t]he practice burdened need not be central to the adherent's belief system, but the adherent must have an honest belief that the practice is important to his free exercise of religion"), *aff'd* __U.S.__, 131 S.Ct. 1651 (2011); *McAlister v. Livingston*, 348 Fed. Appx. 923, 935 (5th Cir. 2009) (noting that in this first inquiry, the Court considers the importance of the practice to McAlister himself).

Without question, keeping kosher qualifies as a "religious exercise" for the practice of Judaism under RLUIPA's definition. *Baranowski*, 486 F.3d at 124. Defendants note, without contravention, that only about fifteen percent of Jews in America keep kosher, and that the pork-free and meat-free trays offered in each TDCJ-CID Unit would meet most Jewish offenders' religious dietary needs. (Docket Entry No.198, page 5 n.8). They concede that such trays would not meet the needs of a strict Orthodox Jewish observant. (*Id.*).

Moussazadeh claims to be Jewish by birth, heritage, and belief. (Docket Entry No.199, page 15). In his Declaration attached to his supplemental motion for summary judgment, Moussazadeh declares his sincerity with respect to maintaining a kosher practice as follows, in pertinent part:

> 4.      I was born and raised in the Jewish faith and remain a sincere adherent of that faith. Both of my parents are devout practitioners of Judaism. To exercise my faith, I believe that the Jewish laws of *kashruth* require me to consume an exclusively kosher diet.
>
> 5.      I will be the first to admit that I am not perfect. I do not always obey all of the commands of my faith as perfectly as I would like, but I sincerely try to consume an exclusively kosher diet whenever possible. For example, while housed at the Stringfellow Unit, I consumed the kosher meals offered there, even though they frequently consisted of highly distasteful tofu and other items that were far less appealing than the regular diet. I ate the far less appealing kosher food because that is what my religious beliefs required. In the past, when I have occasionally slipped up and failed to keep kosher, I have always tried to reform my ways and to continue keeping kosher.
>
> 6.      Although my attendance has not been perfect, I have also sincerely tried to attend Jewish religious services at Eastham, Stringfellow, and Stiles when possible.

(Docket Entry No.199-2, page 155) (emphasis in original).

TDCJ-CID defendants do not question that Moussazadeh is Jewish according to Jewish law or that he is a sinner. (Docket Entry No.205, page 6). Defendants, however,

question the importance of maintaining a kosher practice to Moussazadeh and whether he is an observant Orthodox practitioner (versus a Reform or Conservative practitioner) because "[s]ince his 2005 statement in his grievance regarding his professed belief, Moussazadeh's actions do not show that he sincerely holds that same belief currently."  (Docket Entries No. 198, page 24; No.205, page 6).

Moussazadeh complains that TDCJ-CID defendants have not questioned his sincerity in over five years of litigation and notes that TDCJ Director of Chaplaincy Operations Billy D. Pierce attested in his deposition that he never questioned whether Moussazadeh was Jewish.[6]  (Docket Entry No.201, page 21).  No ruling regarding the sincerity of Moussazadeh's religious beliefs has been made in this case, most likely because the sincerity of Moussazadeh's belief in keeping kosher was not challenged during his incarceration at the Eastham Unit and Stringfellow Unit.  The presumption, if any, that his belief was sincere during his incarceration on the Eastham or Stringfellow Unit, however, does not extend indefinitely into the future to vaccinate Moussazadeh from a challenge to his present belief.   "[P]rison officials may appropriately question whether a prisoner's religiosity, asserted as the basis for a requested accommodation, is authentic."  *Cutter*, 544 U.S. at 725 n.13.

Sincerity of religious belief is not often challenged; therefore, the Fifth Circuit has had little opportunity to address the issue.  *McAlister*, 348 Fed. Appx. at 935 (unpublished per curiam).  However, in a non-RLUIPA case where the plaintiff bore the burden of proving the sincerity of belief, the Fifth Circuit considered the plaintiff's verbal expression of his belief and his conduct as an outward expression of belief in determining that his belief was sincere.  *See*

---

[6] Pierce actually testified that he did not question or look at the sincerity of the inmate professing a religious belief. (Docket Entry No.201-2, page 10).  He attested, "If an offender says that they are Jewish and in Max Moussazadeh's case, I've never questioned whether he was Jewish or not."  (*Id.*).

*A.A. ex rel Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248 (5th Cir. 2010) (noting that district court found that Native American had shown that he held deeply religious belief in wearing visibly long hair because he had not cut his hair in ten to eleven years, professed to others why he held such belief, and sought an exemption from school regulation that required him to hide or cut his hair). The Seventh Circuit Court of Appeals also considered several factors in determining the sincerity of the inmate's belief in its analysis of a RLUIPA claim such as whether the inmate regularly asserted the accommodation based on his religious beliefs and practices and the duration of time over which he sought the accommodation for religious reasons. *See Koger v. Bryan*, 523 F.3d 789, 797-98 (7th Cir. 2008).

Moussazadeh was housed on the Stringfellow Unit from April 27, 2007, to October 13, 2009. His uncontroverted commissary records from September 22, 2008, through September 3, 2009, show that he regularly visited the Stringfellow Unit commissary where he purchased non-kosher food items for consumption even though he was provided with kosher food on the Unit.[7] (Docket Entry No.198-20, pages 4-13). The uncontroverted commissary records also show that from November 5, 2009, to May 27, 2010, while Moussazadeh was classified as a G-5 inmate on the Stiles Unit,[8] he made commissary purchases twice in November 2009, once in January and February 2010, four times in March 2010, twice in April, 2010, and three times in May 2010. He purchased around $24.00 of goods from the commissary on each

---

[7] The record shows that Moussazadeh visited the Stringfellow Commissary one to four times a month and regularly purchased twenty-four soft drinks, ten packages of noodles, two packages of coffee, cookies, flour tortillas, and chips, four packages of tuna, and breakfast foods, and candy. Occasionally, he purchased refried beans, barbeque sauce, ketchup, jalapenos, squeeze cheese, nuts, pastries, beef tips, and peanut butter. (Docket Entry No.198-20, pages 4-13). The only designated kosher items he regularly purchased were dill pickles. (*Id.*). Over this period, Moussazadeh spent from $8.00 to $105.00 on food and a few personal items per trip. (*Id.*).

[8] On September 22, 2009, plaintiff's classification was downgraded to G-5 and on October 13, 2009, he was transferred to the Stiles Unit. (Docket Entry No.198-8, page 3). Moussazadeh remained at a G-5 custody level until November 2, 2010, when he was reclassified at G-4. On November 16, 2010, Moussazadeh was upgraded to G-2 custody. (*Id.*). On March 18, 2011, he was reclassified as G-5, after he received another major disciplinary case. (Docket Entry No.221, n.3).

occasion, except on November 12, 2009, when he purchased $42.85 of goods, and on March 30, 2010, when he purchased a Passover Meal for $85.00.  With the exception of a few personal items, he continued to purchase soft drinks and noodles, a few packages of coffee, cookies, chips, candy, and so forth.  (Docket Entry No.198-20, pages 14-17).  Except for the Passover Meal and occasional kosher dill pickles, none of the items purchased were denoted as kosher. (*Id*.).

Moussazadeh indicates in his Declaration that TDCJ regulations prohibited him from spending more than $25.00 every two weeks at the Stiles Commissary because he was classified as G-5 (Docket Entry No.199-2), although he does not dispute the aforementioned record.  He claims that this amount includes his personal items; consequently, it was impossible for him to keep kosher by purchasing kosher meals at the commissary.  (*Id.*).  Moussazadeh does not claim, and the aforementioned records do not show, that he purchased any kosher meal or item from the Stiles Unit commissary, except for the yearly Passover Meal.  (Docket Entry No.198, page 22).  He does not indicate that he attempted to purchase kosher food and was denied the same by the alleged spending limitation pursuant to TDCJ-CID policy.

TDCJ-CID defendants also note that Moussazadeh did not request a transfer back to the Stringfellow Unit for religious reasons when he became eligible for such transfer and that he filed no grievances complaining that he was denied kosher meals or any religious practice on the Stiles Unit.  (Docket Entry No.198, page 24).  They further note that Moussazadeh voluntarily committed major disciplinary violations that resulted in a change of his custodial classification, thereby, depriving him of the opportunity to transfer back to the Stringfellow Unit, where he could freely obtain kosher food.  (*Id*.).

In his response to TDCJ-CID defendants' summary judgment motion, Moussazadeh downplays the record of his commissary purchases as "a sample" and contends that TDCJ-CID defendants ignore undisputed evidence that keeping kosher is deeply rooted in his heritage, *i.e.*, he was born and raised Jewish by Jewish parents, who kept a kosher household. (Docket Entry No.201, page 21). Moussazadeh maintains that there is no evidence that he falsely declared a belief in Judaism to gain some special benefit, such as fresh produce and meat products, but that he requested a kosher diet long before TDCJ-CID offered any kosher option. (*Id.*, page 22). Moussazadeh cites as evidence of his sincerity in maintaining a kosher practice his declaration that he suffered hardship for his belief at the Stringfellow Unit, *i.e.*, he ate "less appealing kosher food." (*Id.*). Moussazadeh does not, however, refute that he did not maintain an exclusively kosher diet while on the Stringfellow and Stiles Units or that he purchased non-kosher food items for his personal consumption from the unit commissaries. (*Id.*).

Moussazadeh also claims that he suffered retaliation for his religious beliefs at the hands of prison officials on the Stringfellow Unit, which included anti-Semitic comments, cell searches, and unfounded disciplinary actions. (*Id.*). In support of this contention, Moussazadeh cites to a letter written by his attorney to the attorney for TDCJ-CID defendants, complaining of the same. (*Id.*) (citing to Docket Entry No.109, page 1). The Court notes that Moussazadeh does not allege, and the record does not show, that he grieved these matters to prison officials.

In short, Moussazadeh's evidence of his sincerity in consuming "an exclusively kosher diet" for religious reasons is that he is Jewish by birth, he was raised in a kosher household, he did not falsely profess his belief in Judaism to gain a benefit, he endured hardship by eating distasteful kosher food on the Stringfellow Unit, he suffered retaliation at the hands of Stringfellow prison officials for his beliefs and for filing suit, and he is a sincere sinner. (Docket

Entries No.199, pages 23-24; No.201, pages 21-23; No.204, page 12).   While he professes a sincerity of belief, he proffers no evidence to support his declaration or to show that he maintained an exclusively kosher diet when one was provided.

Moreover, he proffers no evidence to contravene TDCJ-CID's defendants' summary judgment evidence, which shows that while on the Stiles Unit, he has not purchased a kosher meal except for the yearly Passover Meal or complained by grievance that kosher meals were not offered by the Stiles Unit kitchen.   Nor has he indicated, by an affirmative expression or by his conduct, a desire to return to the Stringfellow Unit where kosher meals are provided. *Compare Horacek v. Burnett*, Civil Action No.07-11885, 2008 WL 4427825 at *8 (E.D. Mich. Aug. 19, 2008) (evidence showed plaintiff passed eligibility test and had chaplain's recommendation for placement in kosher meal program and that plaintiff submitted affidavits, his own and other Jewish inmates, attesting to the sincerity of his religious beliefs and his active participation in Jewish services, study groups and other religious activities); *Terrell v. Montalbano*, Civil Action No.7:07-cv-00518, 2008 WL 4679540 at*6 (W.D. Va. Oct. 21, 2008) (inmate offered explanation why he ate non-kosher food and showed that he sought alternative food such as the no-meat diet before resuming kosher practice).

Moussazadeh's conclusory declaration does not demonstrate that his professed religious need for a kosher diet motivates his actions or that he has attempted to reform his ways and return to keeping kosher during his two-year incarceration on the Stiles Unit.   Rather, his personal desire to harass defendants with an unnecessary lawsuit took precedence, and he was willing to sacrifice his religious dietary beliefs in favor of this secular pursuit.   Indeed, he would be without any access to kosher food to this day had defendants not attempted to accommodate his dietary beliefs.

Accordingly, the Court finds that the TDCJ-CID defendants have shown that Moussazadeh has failed to satisfy the threshold issue in his case and have established Moussazadeh's lack of sincerity regarding a kosher practice as a matter of law.  As Moussazadeh fails to offer competent evidence on which he could prove that his religious dietary beliefs were sincere following his transfer to the Stiles Unit, the Court finds that the TDCJ-CID defendants are entitled to summary judgment as to all of Moussazadeh's claims in this lawsuit.  Absent proof of sincerity, he has no right to accommodation of his religious dietary beliefs under the RLUIPA or injunctive or declaratory relief.

### III. CONCLUSION

Based on the foregoing, the Court REAFFIRMS its holding that Moussazadeh's requests for injunctive and declaratory relief from the denial of a kosher diet on the Eastham Unit are moot, for the reasons stated therein.  (Docket Entry No.135).

The Court AMENDS its Opinion on Dismissal of March 26, 2009, (Docket Entry No.135) with the following ORDERS:

1. Moussazadeh's Opposed Motion to Strike (Docket Entry No.203) is DENIED.

2. TDCJ-CID defendants' Motion to Strike (Docket Entry No.206) is GRANTED.  Moussazadeh's Exhibits 35 and 36 attached to Moussazadeh's Opposition to TDCJ-CID defendants' Second Motion for Summary Judgment (Docket Entry No.201-2, pages 12-32) shall be STRICKEN from the record.

3. The supplemental summary judgment motion filed by TDCJ-CID defendants, *i.e.,* the Texas Department of Criminal Justice, Brad Livingston, and David Sweeten, is GRANTED.  (Docket Entry No.198).  All claims against defendants are DENIED.

4. The supplemental summary judgment motion filed by plaintiff Max Moussazadeh (Docket Entry No.199) is DENIED.

5.        All other pending motions, if any, are DENIED.

6.        This case is DISMISSED WITH PREJUDICE.

The Clerk shall provide a copy of this Opinion on Remand to the parties.

SIGNED at Houston, Texas, this 20th day of September, 2011.

_____
MELINDA HARMON
UNITED STATES DISTRICT JUDGE